**UNITED DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| LINDA L. CARMODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV0044 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Linda Carmody was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434.  For the reasons set forth below, the decision of the

Commissioner shall be affirmed.

Plaintiff, who was born on February 9, 1941, filed for disability benefits on June

15, 2004, at the age of 63, claiming a disability onset date of May 28, 2004, due to vision

problems, right wrist problems, and neck and shoulder problems.  (Tr. at 73, 132.)  After

her application was denied at the initial administrative level, Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ") and such a hearing was held on March 22,

2006.  The ALJ found that Plaintiff could return to her former work as a legal

---

[1]   The parties have consented  to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

secretary/office manager, and was thus not disabled. Plaintiff requested a review of the ALJ's decision by the Appeals Council of the Social Security Administration and submitted additional evidence for the Council to consider. Her request for review was denied on March 6, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's finding that Plaintiff was capable of performing her past relevant work is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ did not give enough weight to the medical opinion of a certain optometrist (Daniel Obermark, O.D.), to Plaintiff's testimony, and to the medical record, and instead relied upon the flawed Residual Functioning Capacity ("RFC") assessment of a non-medical individual. Plaintiff argues that the ALJ should have applied the Commissioner's Medical-Vocational Guidelines ("Guidelines"), which would have resulted in a finding that Plaintiff was disabled. She requests that the decision of the Commissioner be reversed, and that the case be remanded with directions to find that Plaintiff was disabled as of May 28, 2004.

**Work History and Application Forms**

The record establishes that Plaintiff worked full time at one law firm as a legal secretary and office manager for approximately 30 years, until May 2004. Id. at 321, 324. She testified at the March 2, 2006 evidentiary hearing that she was then working at the firm one day a week. Id. at 309. Plaintiff's earnings records show an annual income of under $20,000 until 1987, of approximately $25,000 through 2003, and of

2

approximately $12,600 in 2004.  Id. at 55.  Her 2005 W-2 form showed earnings of

$4,142, and payroll records showed earnings in the first quarter of 2006 of $1,126, both

from the law firm at which she worked.  Id. at 52, 53.

In her Disability Report completed on June 7, 2004,[2] Plaintiff stated that she

stopped working on May 28, 2004, because, "My position was terminated and I don't feel

I can work somewhere else and start from scratch.  My employer died and I couldn't be

kept on."  Id. at 133.  When asked how her impairments limited her ability to work,

Plaintiff responded as follows:

> Staring at the computer constantly hurts my eyes as they are strained and
> get blurry as I have stimatic [sic] also and I can't focus when I get tired.
> Loss of peripheral vision affects me.  When I look down or write receipts, I
> can't see people on my right.  Right hand and fingers tires easily and hurts.
> Neck and shoulders hurt after sitting at my desk for a while.

Id.

Plaintiff completed a Function Report on July 7, 2004, describing her daily

activities and physical abilities.  Her daily activities included doing laundry and other

housework, preparing her meals, possibly walking for 30 minutes, watching television,

visiting with friends, and reading.  Plaintiff stated she had some limitations with her right

hand.  For example, she had to use both hands to move heavy pots.  Her ability to open

jars or bottles, grip handles, and turn on switches with her right hand was limited.

Ironing required more time than normal because she had to take breaks to rest her right

_____

[2]        This report was completed by a Social Security Administration telephone
interviewer.

hand.  In addition, her shoulders and arms tired more easily when drying or brushing her hair, requiring her to take breaks.  Id. at 117-28.  Plaintiff wrote that she was able to drive and went grocery shopping weekly.  She had to be careful and aware of her surroundings when walking, to watch for a rise in the sidewalk, hole in the pavement, or unnoticeable grassy area, and she did not walk in the evening if she was not on a familiar path.  Plaintiff visited friends and family out of state, went shopping and out to eat, and attended church and sporting events.  Id. at 117-28.

Plaintiff noted that she was limited in her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb and descend stairs, see, and use her hands.  She noted that she could walk a mile before needing to take a 15 minute rest, but had been able to walk two or two and a half miles.  Plaintiff feared being caught in the car in a sudden rain storm, making visibility very poor because her eyes did not adjust quickly from light to dark, and had to "stand longer" in a dark theater to wait for her eyes to adjust before finding a seat.  She wore trifocals, and sunglasses in the sun.  Plaintiff had difficulty seeing a white door handle on a white car, and difficulty seeing differences among white concrete steps, porches, or streets.  In addition, it was harder for her to play tennis and she often missed things that were tossed to her.  Plaintiff reported difficulty "looking into the sun," and driving after dark because oncoming lights had a blinding effect.  She had difficulty reading print on a computer screen and sometimes had to shield her eyes when walking into a store with bright lights.  Plaintiff reported that due to the loss of her peripheral vision, she was unable to see when someone approached her desk at work.  Id. at 117-28.

Plaintiff's right hand injury limited her ability to type long documents, use a stapler, handle files, and carry reams of paper at work. Plaintiff's shoulder and neck problems made reaching above her head difficult, and she would use both hands to carry heavier things or would carry fewer things at once. Plaintiff stated that, "I can't do things exactly the way I used to, but I keep on trying to do the best I can and take a little longer." Id. at 117-28.

**Medical Record**

The medical record shows that on November 1, 1990, Plaintiff had laser eye surgery for glaucoma, performed by Kenneth Barkett, M.D. Id. at 162. On January 27, 1999, Todd Altenbernd, M.D., examined Plaintiff, and reported his findings in a letter dated February 8, 1999. At that time Plaintiff was taking Estrace, Pouvera, calcium, Gluscosamine, and Chondroitin. Dr. Altenbernd reported that Plaintiff's pupils were non-reactive to light, her visual acuity was 20/40+1 in each eye, and her intraocular pressure was 20 and 18 in the right and left eyes, respectively, with a goal intraocular pressure of less than 15. Dr. Altenbernd opined that Plaintiff had end-stage glaucoma in both eyes and that it was very likely that Plaintiff was going to go blind in one eye, and possibly both eyes. He prescribed Cosopt twice a day for the right eye and Xalatan once a day for both eyes. Id. at 162-65, 177-78.

Following an examination of Plaintiff on February 11, 1999, Dr. Altenbernd reported that Plaintiff's pressure was 12 in the right eye and 15 in the left eye, and that Plaintiff had less than one percent of nerve left in her right eye and probably between one

and two percent left in her left eye.  Id. at 174.  In a letter dated February 18,1999, Dr.

Altenbernd stated that photographs of Plaintiff's optic nerves "are probably not of much

use since her optic nerve was so terribly damaged.  It is impossible to determine whether

you [sic] are 99% gone or 99.9% gone."  Id. at 176.  On November 17, 1999, Dr.

Alternbernd noted that Plaintiff was taking Zoloft (used to treat depression and anxiety).

Id. at 155.

Reporting on Plaintiff's visits of November 16 and 17, 2000, Dr. Altenbernd noted

in letters dated December 3 and 28, 2000, that Plaintiff's vision was "reasonable and

relatively unchanged," pressure was 11 in both eyes, she recently passed her driver's

license test, and both eyes appeared stable.  He advised against cataract surgery.  Id. at

168-69, 171.  Dr. Altenbernd reported similar findings on various other dates.

On June 26, 2001, Plaintiff was seen by D. Shawn Parker, M.D., who advised her

that she needed a prescription for new glasses.  Plaintiff complained of joint pain for

which she was using samples of Vioxx.  Plaintiff's vision was 20/50 and 20/50-1, and her

pressure was 11 in both eyes.  Id. at 142.

On July 13, 2001, Plaintiff visited John Askew, M.D., after falling and hurting her

right wrist and the right side of her face.  Dr. Askew put Plaintiff in a velcro splint and

stated that her facial bones looked normal.  On July 16, 2001, Plaintiff visited Dr. Askew

again and he confirmed through x-rays that her wrist showed a chip fracture of the styloid

process.  Fred H. Thornton, M.D., put Plaintiff in a short arm cast on July 20, 2001.  On

August 9, 2001, Plaintiff's cast was removed and Plaintiff began use of a splint.  Plaintiff

reported some difficulty moving her little finger and ring finger on her right hand. Dr. Thornton reported that the fracture looked "quite good" on August 21, 2001. Also on that date, Plaintiff complained of stiffness in her hand joints, which Dr. Thornton attributed to immobilization of the hand, and she complained of numbness in the right thumb, which Dr. Thornton thought might be caused by pressure on a sensory nerve from the splint. Dr. Thornton noted that Plaintiff should continue not working and start physical therapy. Id. at 267-69.

On August 22, 2001, Dr. Thornton reported some healing of the radial styloid fracture, but noted that there was soft tissue swelling or prominence over the dorsum of the wrist, which might indicate some cartilaginous injury. He recommended an MRI or arthrography. Id. at 272.

When Plaintiff returned to Dr. Thornton on September 4, 2001, he reported tenderness over the fracture. The fracture line remained visible, but Dr. Thornton noted that it was in excellent position. Also, he reported that he did not think that Plaintiff could type yet. Id. at 267. On September 6, 2001, Dr. Thornton reported degenerative changes with some narrowing at the joints, and prominence of the soft tissues over the dorsum of the wrist. Id. at 271. On September 18, 2001, Dr. Thornton reported that Plaintiff's wrist was "doing well with minimal problems," but that she still had weakness. Dr. Thornton opined that Plaintiff, who had not yet returned to work, could not type "all day," and he prescribed Vioxx. Id. at 266.

Dr. Thornton reported on September 25, 2001, that Plaintiff's strength was

improving but she still had aching and discomfort. In addition, Dr. Thornton noted that Plaintiff still had frequent catches in her wrist, but her swelling was down, and he "left her off [work] for the present time" because her employer did not "want her back at work until she [was] 100%." Id. On October 2, 2001, Plaintiff complained of numbness in her thumb. On October 8, 2001, Dr. Thornton cleared Plaintiff to return to work. Id. at 265.

On October 30, 2001, Plaintiff told Dr. Thornton that she had trouble with the base of her thumb. Dr. Thornton reported a knot in the flexor tendon, representing tenosynovitis. He injected steroids, put an ace wrap on Plaintiff's hand, prescribed Vioxx, and reported that the wrist fracture looked very good and well healed. Id. at 265. Plaintiff saw Dr. Thornton again on November 20, 2001. She complained that her middle finger did not feel right, and that it did not want to straighten out. Dr. Thornton reported that Plaintiff had full range of motion in the finger, and that the hand appeared "pretty normal," although she had swelling in the tendon. Id. Dr. Thornton administered another steroid injection in the tendon. Id. at 264. On January 28, 2002, Plaintiff saw Dr. Thornton and complained of fatigue in her hand, and hypothenar and thenar atrophy. Dr. Thornton stated that she had full range of motion of the fingers with good grip, and that the hypothenar and thenar atrophy was not "readily apparent." Id. at 263.

Dr. Barkett examined Plaintiff on January 26, 2003, and noted that her corrected vision was 20/25 and 20/30. Id. at 190. On May 7 and September 3, 2003, Dr. Barkett reported the same visual acuities. Id. Dr. Askew diagnosed Plaintiff with diabetes and hyperlipidemia on November 17, 2003. Dr. Askew continued Plaintiff's Zoloft

prescription, noted that a recent ultrasound revealed mild plaque in Plaintiff's carotid arteries, that her systolic pressure in her arm and ankle was elevated, and that her lipids were elevated. Id. at 189. Cedric Strange, M.D., diagnosed Plaintiff with multiple nodules in the thyroid gland on November 20, 2003. Id. at 193.

On January 15, 2004, Plaintiff complained to Joe Chehade, M.D., of fatigue and joint pain in her knee. Id. at 221. Dr. Chehade reported to Dr. Askew that Plaintiff had a small multinodular goiter, hypertriglyceridemia, and impaired glucose tolerance or Syndrome X (a metabolic disorder including insulin resistance and hypertension). Dr. Chehade recommended monitoring the thyroid nodules, and advised that Plaintiff had elevated blood sugar and triglycerides, and was on the verge of being diabetic. Id. at 217-18. On March 15, 2004, Dr. Chehade provided Plaintiff with samples of Lipitor and reported continued monitoring of her thyroid, blood sugar, and lipid levels. His diagnosis on March 15, 2004, was a small nodular goiter, impaired glucose tolerance, Syndrome X, and combined hyperlipidemia. Id. at 216. On March 24, 2004, Dr. Askew refilled Plaintiff's prescription of Bentyl, and talked with Plaintiff about the possibility of discontinuing anti-depressants, which he did not recommend. Id. at 188.

The medical records show that Plaintiff saw Jeffrey C. Harrison, D.C., for treatment beginning in April, 2004.[3] Initially, on April 21, 2004, she complained of neck

---

[3]    Apparently, Plaintiff had seen Dr. Harrison prior to this time, as the record from April 21, 2004 begins with the note: "[Patient] says she should have never quit coming." Id. at 204.

and shoulder pain, and numbness and tingling in her hands and fingers. She indicated that her right shoulder hurt all the time and that her neck had gotten worse in the past month. She reported that she took Ibuprofen to help with the pain. Her medications at the time were noted as Cosopt, Zoloft, and Lipitor. Id. at 203-04. Plaintiff returned to Dr. Harrison on April 23, April 28, and April 30, 2004, each time stating that she was "better." Id. at 203. On April 26, 2004, Dr. Askew suggested that Plaintiff continue on Lipitor. Id. at 187. On May 3 and May 5, 2004, Plaintiff complained to Dr. Harrison of discomfort in her neck. Id. at 202. On May 12, 2004, Plaintiff complained that she was "not so good." Id. On May 14, 2004, she complained of a tingling and "dead" feeling in her left arm down into her hand, and neck pain on a recent evening, which she treated with a generic Bengay product. Id. On May 17, 2004, Plaintiff indicated that there was less tingling in her left arm. Id. at 201. On May 21, 2004, Plaintiff stated that she had no tingling, aches, or pains since her last visit, and on May 24, 2004, she stated that although the side of her neck hurt the previous night, she felt better that day. Id. at 201.

On June 4, 2004, Plaintiff complained to Dr. Harrison that her medication was causing muscle aches. Id. On June 7, 2004, Plaintiff stated that she felt pretty good. Id. On June 14, 2004, she complained of stiffness in her neck and shoulders, but stated that she was doing "ok" on June 18, 2004. Id. at 200. Plaintiff continued to see Dr. Harrison, and on June 25, 2004, she stated that she had neck, shoulder, and back pain and indicated that she had worked the previous Monday, Tuesday, and Wednesday. Id. On June 28, 2004, Dr. Askew reported that Plaintiff was on Lipitor and Zoloft, and that her lipids

were under "adequate" control.  Id. at 235.  Also on June 28, 2004, Plaintiff reported to

Dr. Harrison that she felt pretty good.  Id. at 199.  On June 30, 2004, the last date for

which records were provided, Plaintiff reported to Dr. Harrison that she felt pretty good,

but she complained of tenderness at the base of her neck.  Id.

Plaintiff returned to Dr. Barkett on July 26, 2004, with complaints of blurred

vision.  Dr. Barkett reported that Plaintiff's visual acuity was 20/30 and 20/40, with

pressures of 12 and 14.  Id. at 249.  Also on July 26, 2004, Plaintiff had a thyroid

ultrasound that revealed small hypoechoic nodules involving both the right and left lobes,

with the largest in the inferior aspect of the left lobe.  Id. at 215.  A lipid study from that

day revealed that Plaintiff had a less than average risk for developing coronary heart

disease.  Id. at 214.

In a letter to the state disability determinations agency, dated July 29, 2004, Daniel

Obermark, O.D., stated that he had last seen Plaintiff on April 21, 2004, and that her

corrected acuity at that time was 20/30 in both eyes with a pressure of 13 in the right eye

and 12 in the left eye.  His impression was glaucoma and pseudophakia in the right eye.

He stated that there was a "combined visual system loss" of 89 percent in the right eye

and 71 percent in the left eye.  The doctor opined that this would make it 80 percent more

difficult for Plaintiff to perform sedentary work such as filling out forms, checking IDs,

and reading price tags; she would have very little ability to perform bench assembly,

follow diagrams, or work as an inspector; and that Plaintiff would be at risk for further

injury to herself and co-workers due to her inability to avoid hazards, such as ajar doors,

11

boxes on the floor, or approaching people or vehicles.  Id. at 207.

On July 30, 2004, Plaintiff told Dr. Chehade that she had no new complaints since her last visit (presumably on March 15, 2004), and that she had discontinued Lipitor on her own two weeks prior due to muscle aching in her shoulder.  Dr. Chehade stated that Plaintiff's lipids were much better while on Lipitor.  Dr. Chehade prescribed Crestor in place of Lipitor.  He also prescribed Glucophage.  Dr. Chehade's diagnosis was a small nodular goiter, early Type 2 diabetes, and combined hyperlipidemia.  Id. at 212.

On September 15, 2004, Carl Nelson Ringer, M.D., noted that Plaintiff's record showed "a recent 10.2 visual field which shows severe constriction in both eyes" and that a Goldman Visual Field Test should be conducted.  Id. at 110.  On September 28, 2004, Dr. Askew noted that Plaintiff's lipids were under control, though she continued to have elevated triclycerides, and that she was doing well and had no other problems at that time. It is unclear whether Dr. Askew increased Plaintiff's Lipitor dosage at that time or prescribed Crestor instead.  Id. at 235.

David Lee, M.D., conducted a Goldman Visual Field Test (Goldman perimetry) on September 29, 2004, from which he concluded that Plaintiff had an enlarged blind spot on the right side with major extension below the horizontal meridian, moderate contraction of the right visual field, and mild to moderate contraction of the left visual field.  The technician noted that Plaintiff walked into and out of the examination room unaided.  Id. at 223.

On October 27, 2004, Dr. Barkett reported that Plaintiff had blurred vision, with a

visual acuity of 20/30 and 20/40, and pressures of 12 and 14.  Id. at 249.  On November

4, 2004, Dr. Chehade indicated that Plaintiff had no new complaints since her last visit

(presumably on July 30, 2004), that she was tolerating Crestor, that she had occasional

shoulder pain, and that her type 2 diabetes was under "good control."  Id. at 261.  On

November 9, 2004, Dr. Askew found that Plaintiff's lipids were under control and,

although her triglycerides were still slightly high, Plaintiff was "otherwise doing well

along those lines."  Id. at 234.

State Disability Examiner Christy Huff completed a physical RFC assessment

form on November 10, 2004, based upon her review of the medical record.  Huff

indicated in check-box format that Plaintiff had no exertional limitations (e.g., lifting and

carrying), and no manipulative limitations (e.g., handling and fingering).  Although Huff

noted in check-box format that no visual limitations were established, Huff stated in

narrative format that Plaintiff had a long history of treatment for visual impairment and

that due to the loss of peripheral vision, limitations were appropriate.  In check-box

format, Huff noted that Plaintiff could occasionally climb ramps and stairs; and could

frequently balance, stoop, kneel, crouch, and crawl.  Huff noted that Plaintiff was

unlimited by extreme cold, extreme heat, wetness, humidity, noise, vibration, and

fumes/odors/dusts/gases/poor ventilation, but should avoid concentrated exposure to

hazards (machinery, heights, etc.) due to loss of peripheral vision.  Huff determined that

Plaintiff's visual acuity remained "intact," and that while Plaintiff had an impairment that

limited some activities, there were no significant exertional limitations as the result of a

physical impairment. Huff stated that the evidence did not support allegations of a disability, and that Plaintiff's "statements [were] only partially credible." Id. at 94-102.

Also on November 10, 2004, the record was reviewed by Dr. Ringer, who reported that Plaintiff had visual acuities of 20/30 in both eyes, which was 92%, which did not meet a listing of a presumed-disabling impairment. He reported that the visual field efficiencies were 20.6% in the right eye and 38.44% in the left eye. Dr. Ringer noted that Plaintiff had glaucoma damage to her optic nerves resulting in a loss of peripheral vision. He noted, however, that Plaintiff retained her straight ahead vision, and that her near and far acuity, depth perception, accommodation, and color vision were all good. He opined that due to the loss of side vision, Plaintiff should not engage in dangerous work or activities. Id. at 109.

On November 12, 2004, Joan Singer, Ph.D., completed a Psychiatric Review Technique form indicating that Plaintiff had no medically determinable psychiatric impairments, noting that Plaintiff had been prescribed Zoloft, and was fairly active and independent. Id. 80, 92. Also on November 12, 2004, a DEXA scan (test for osteopenia and osteoporosis) showed that Plaintiff's lumbar spine appeared normal, with a two percent per year decrease in total bone mineral density since April 2002. The impression was "osteopenia, left hip, with interval lessening of bone mineral density." Id. at 250.

Dr. Askew examined Plaintiff on November 22, 2004, and noted osteopenia of the left hip with interval lessening since the last bone density test, but otherwise a normal back in the lumbar area. Dr. Askew changed Plaintiff's prescription of Crestor to Lipior;

14

her other medications remained the same.  Id. at 233.

On November 29, 2004, Dr. Barkett reported that Plaintiff's visual acuity was 20/30 and 20/40, and her pressures were 12 and 14.  Id. at 249.  On December 1, 2004, Dr. Askew noted that Plaintiff had a history of obvious hematuria (blood in the urine) which Plaintiff needed to discuss further with Dr. Killion.  Id. at 232.

On December 13, 2004, Plaintiff fell again on the street and sustained several small facial abrasions in the chin and lip area, several fractured teeth, and a partially avulsed tooth, requiring a tooth repositioning and splint, which was performed on that day  and a root canal which was performed on December 16, 2004, and again on February 1, 2005.  Id. at 276-78.

On January 25, 2005, Dr. Askew noted that Plaintiff's lipids were under "good control," but her triglycerides had "crept up."  He emphasized dietary discretion.  Id. at 231.  On May 25, 2005, Dr. Askew and Plaintiff discussed Plaintiff's lipid profile and hematuria.  Dr. Askew recommended that Plaintiff see Dr. Killion for further evaluation. Plaintiff remained on Lipitor and was trying to slowly decrease her use of Zoloft.  Id. at 231.  On June 16, 2005, Plaintiff's visual acuity was 20/40 in each eye, with pressures of 13 and 15.  Id. at 248.

On July 12, 2005, Dr. Chehade, following up on Plaintiff's thyroid and diabetes, reported that Plaintiff had no new complaints since her last visit, was tolerating Glucophage and Lipitor, had no muscle or joint aching, and her Type 2 diabetes was under "good control."  Id. at 259.

15

On December 19, 2005, Dr. Barkett noted that Plaintiff's visual acuity was 20/30 in each eye, with pressures of 15 and 16. Id. at 248. Plaintiff saw William Bryant, M.D., on December 22, 2005, complaining of pain and tenderness over her left maxillary sinus, with nasal congestion. Dr. Bryant noted Plaintiff's history of diabetes and hyperlipidemia, and that she had discontinued Lipitor. Plaintiff was diagnosed with maxillary sinusitis and prescribed Zithromax and Simprex for congestion, and Zocor for hyperlipidemia. Id. at 228.

A radiology exam report from February 13, 2006, compared ultrasound thyroid results to a previous study dated July 26, 2004, and found a significant change in the appearance of Plaintiff's cystic nodule seen in the lower lobe of the left thyroid gland, which demonstrated slight heterogeneous echogenicity. There was no significant change in the small scattered hypoechoic nodules, and the lesion did not appear to have changed when compared to the previous study. Id. at 258. Also on February 13, 2006, Dr. Bryant saw Plaintiff for follow up and found that she was "doing well." Dr. Bryant noted Plaintiff's history of depression, diabetes mellitus, and hyperlipidemia, and that Plaintiff was taking Zoloft, Metformin, Cosopt, and was tolerating Zocor well. Id. at 226-27.

After his visit with Plaintiff on February 15, 2006, Dr. Chehade reported that Plaintiff had admittedly not been very compliant with her diet, and had muscle aches while on Lipitor. She had discontinued Lipitor and had been on Zocor for 1-2 weeks which she was tolerating well without muscle or joint aching. Plaintiff was also tolerating Glucophage. She had a few cystic areas in her thyroid nodule measuring a few

millimeters.  Her diabetes was under "good control."  Dr. Chehade noted hyperlipidemia, hypertriglyceridemia, and a multinodular goiter.  Id. at 256.

On February 27, 2006, Dr. Obermark noted that Plaintiff's left eye seemed to be changing, making it harder to read, and making things "not clear."  At the time, Plaintiff was on Zoloft, Metformin, Zocor, Cospot, and Glucatoge.  Id.  at 253.

**Evidentiary Hearing of March 22, 2006**

 Plaintiff testified that she was 65, had completed the 12th grade, and was currently working one day a week at a law firm.  When asked by the ALJ whether she was doing the same work as always, she responded, "Well basically not nearly as much," continuing  that she was now there mainly as a back-up "second person in the office" to answer the phones, read the appointments coming in, and do some typing.  She testified that she was being paid by the hour, and that she had been employed full time until the end of May 2004.  She was single, had a driver's license, drove to the hearing, ran errands like grocery shopping a couple of times a week, driving six or seven miles, and since December 1, 2006, lived in an independent apartment connected to a relative's house.  Id. at 307-12.

Plaintiff testified that the most significant problem that interfered with her work was her "eyes and lengthy work, straining, looking."  Also, when she sat for long periods of time she experienced discomfort in her neck and shoulders.  She testified that she had trouble with "darkened hallways" and with walking from a dimly-lit area into a sunny room, and that as she got older, she had problems with her lower back and with the

circulation in her knees.  She denied having any psychiatric or psychological problems that interfered with her ability to work.  Id. at 312-13.

The ALJ then questioned Plaintiff about her medications.  Plaintiff testified that she was prescribed Cosopt eye drops, Zoloft, Metformin, Lipitor -- which was recently changed to Zocor -- and Bentel, all from which she suffered no side effects.  In addition, she was periodically taking ibuprofen, Aleve, baby aspirin, vitamins, calcium, Glucosamine, Chondroitin, and Co-Enzyme Q10.  Id. at 313-15.

Plaintiff testified that during a typical day she would get up between 5:30 a.m. and 8:00 a.m., eat breakfast, shower, dress, unpack boxes from her recent move, make the bed, straighten up her apartment, hang up clothes, and occasionally sit down to watch something interesting on television.  Some mornings she would walk over to visit friends, prepare something simple for lunch, and have a snack.  She testified that she checked her blood sugar three or four times per week, or if "something is not looking right," she would check it daily.  Plaintiff continued to describe a typical afternoon, stating that she usually watched a soap opera from noon to one, sometimes watched a show at four with her cousin in the apartment across the hall, did some more unpacking, talked on the telephone with friends, and sent cards and things off to her grandchildren.  She testified that since the weather was getting better, she would try to walk outdoors.  She no longer rode her bicycle or used a treadmill, but she had a mini trampoline with a brace that she could use to walk in place.  Plaintiff stated that she attended church services on Sundays, and occasionally dined out with friends.  She used a computer at work to prepare letters

and deed forms and to type.  Id. at 316-20.

Upon questioning by her representative, Plaintiff testified that she had worked for her current employer for the past 30 years, functioning as the office manager for the last 25 of those years.  Her typing skills started to decrease after her glaucoma developed in 1990.  She testified that she saw Dr. Barkett[4] every six months to have the pressure in her eyes checked, but there were times when she would see him more often due to changes in medication.  Also, she saw Dr. Obermark[5] for vision tests and glasses, and a glaucoma specialist in Cape Girardeau every couple of years.  Id. at 321-23.

Plaintiff testified that after the onset of glaucoma, the "book-work" in the office was assigned to another employee, because the work had changed from handwritten to computer and the other employee was more computer-literate.  Plaintiff typed the same things as before the glaucoma, but it took her longer to get through the same amount of work.  She testified that her work did require some lifting, mainly moving supplies back and forth from the supply room.  Also, she used to be able to move the large legal files without help but now she was unable to lift and carry them often.  She testified that the reason for this was that she broke her wrist on December 13, 2003, attributing the fall to difficulty with color differentiation and her eye problems.  Plaintiff stated that she had

---

[4] The evidentiary hearing transcript referred to "Dr. Lockette" which presumably was intended to be Dr. Barkett.  Id. at 321-23.

[5] The evidentiary hearing transcript referred to "Dan Overmar" which presumably was intended to be Dr. Obermark.  Id. at 321-23.

problems walking on uneven terrain, and that she tripped and fell over a sinkhole in July 2004, while walking to her car, which resulted in damage to her teeth.  Id. at 324-28.

Upon questioning by the ALJ, Plaintiff corrected the date of the parking lot fall from December 13, 2003, to July 13, 2001.  Plaintiff stated that it was a work-related fall and was settled through workers' compensation.  She thought that her permanent partial disability rating was close to 20.  She stated that she still had problems with her right hand, wrist, and arm, including picking up things, gripping, typing lengthy documents, and grabbing more than one book at a time.  Plaintiff testified that she sprained her little finger and ring finger when she fell on July 13, 2001.  She stated that she did not have any problems caring for her personal needs except her right hand tired when she would blow-dry her hair.  Id. at 328-31.

Plaintiff testified that she had been diagnosed with diabetes a year and a half or two years before the hearing, and that she took Metformin to control her blood sugar level.  She testified that she was diagnosed with irritable bowel syndrome.  Also, if she ate the wrong thing and did not take her medicine, she suffered from periodic diarrhea.  Plaintiff reported that she took Zoloft daily for stress, anxiety, and depression; but she did not feel she was depressed, just that she was in a stressful job when she worked at the law firm.  Also, she switched from Lipitor to Zocor because of feelings of discomfort in her legs and sometimes in her arms and muscles.  Id. at 331-34.

Plaintiff testified that her primary employment since 1960 had been as a legal secretary and office manager, that she did not feel like she could work in a new

environment or new office, and did not think that she could perform her past job duties on a daily basis.  Id. at 334-35.

Plaintiff stated that she wore trifocals for her eyesight problems, as well as large glasses that fit over eyeglasses, which shade all sides of the vision field because her pupils were constantly dilated due to her glaucoma.  She testified that her permanently-dilated eyes impaired her ability to drive at night, and that she only drove in familiar places at night.  Plaintiff testified that she was receiving age-reduced Social Security retirement benefits that started in July of 2004.  Id. at 335-39.

A vocational expert ("VE") testified that Plaintiff's past work as a secretary and office manager was classified as sedentary and skilled, with a Specific Vocational Preparation ("SVP") level of 7 (two to four years of training needed to learn the job). The VE testified that Plaintiff would have such transferrable skills as knowledge and use of office procedures; the ability to maintain records and inventories; the ability to greet the public; and the ability to operate office equipment including computers, calculators, copy machines, and phone systems.  He testified that these skills could secure Plaintiff a job as a receptionist.  Id. at 339-40.

The ALJ asked the VE whether an individual who was limited to climbing ramps or stairs on no more than an occasional basis, and who should avoid all exposure to hazards, such as unprotected heights and dangerous machinery, would be prevented from performing Plaintiff's past work.  The VE responded that she would not.  The ALJ then asked the VE about such an individual who could only deal with jobs that did not require

extensive peripheral vision, who could only rarely be placed in a situation of going from a bright location to a dark location, and who could only rarely drive at night.  The VE testified that, aside from having to leave work before dark in the wintertime, these additional factors would not affect the hypothetical individual's ability to perform Plaintiff's past work.  The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations.  Id. at 340-41.

Plaintiff's attorney[6] asked the VE if a person would be able to perform Plaintiff's past work if she had an 80 percent loss in the efficiency of her eyesight and extreme difficulty in filling out forms, checking ID's, and reading price tags.  The VE responded that those conditions would affect a persons ability to perform Plaintiff's past work, but that a 71 percent loss would not change his answer to the preceding hypothetical. Plaintiff's attorney asked the VE if, with the limitations of the second hypothetical, Plaintiff would be precluded from doing other types of work.  The VE responded that jobs such as a receptionist would not be seriously affected by the limitations.  Id. at 341-43.

Plaintiff's attorney then posed another hypothetical in which an individual had extreme limitations in her peripheral vision; had problems walking, differentiating from different grade levels in terrain (for example, steps), typing as a result of a broken wrist,

---

[6]     Plaintiff's attorney was a member of the law firm for which Plaintiff worked.

and aged 64 years old, maintaining pace, and lifting anything heavier than two or three books; was limited to driving during the day; and had to miss work to see her doctors one or two times per month. The VE testified that missing work one day a month to see a doctor was tolerated and two days per month was generally tolerated. He stated that if the individual could not operate office equipment at a pace where she was considered productive, she would not be employable in a competitive work environment.

Plaintiff's attorney then posed another hypothetical in which the individual was limited to climbing and using ramps or stairs no more than occasionally; had to avoid all exposure to hazards, such as unprotected heights and dangerous machinery; and had unclear vision which caused problems that included walking on uneven terrain, falling, and being unstable on her feet. The VE responded that this would not affect the individual's ability to perform Plaintiff's past work. He stated that individuals with 20/40 vision can perform office work; individuals with 20/60 or 20/70 cannot. In response to questions by the ALJ, the VE testified that there are 925,000 sedentary receptionist jobs in the national economy, and 40,000 in Missouri.[7] Id. at 347-55.

**ALJ's Decision of November 17, 2005**

The ALJ found that Plaintiff suffered from glaucoma, diabetes mellitus, osteopenia, osteoarthritis, restricted visual fields, and fixed pupils in both eyes but that these

---

[7] At the conclusion of the hearing, Plaintiff's attorney asked to have the visual field efficiency test re-interpreted by a doctor other than Dr. Ringer. The ALJ left the record open for 30 days to investigate the request. No such documents were submitted.

impairments did not equal in duration or severity the criteria established under the listings of presumed-disabling impairment in the Commissioner's regulations. The ALJ proceeded to consider whether Plaintiff could perform her past relevant work or any other work existing in significant numbers, noting the relevant factors for evaluating subjective complaints, as set forth in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). Id. at 12-13.

The ALJ next summarized Plaintiff's testimony at the hearing pertaining to her work activity, daily activity, and her health problems. The ALJ also summarized the record relating to Plaintiff's contact with Drs. Altenbernd, Thornton, Chehade, Lee, Freeman, Askew, Bryant, Harrison, and Singer. With respect to Dr. Obermark's July 29, 2004 glaucoma evaluation, the ALJ noted that even though Dr. Obermark opined that Plaintiff's visual deficiencies would make it 80 percent more difficult to perform sedentary work, Plaintiff continued to work one day a week in a law office. The ALJ also noted that Dr. Ringer opined that Plaintiff should not engage in dangerous work but did not preclude all work activity. Id. at 13-16.

The ALJ found that the evidence established that Plaintiff was frequently without prescribed pain medication, and that this was inconsistent with allegations of severe pain. According to the ALJ, allegations of debilitating symptoms and limitations, including severe pain and limitation of motion, precluding even sedentary work activity, would result in medical records documenting at least some significant atrophy or loss of muscle tone, thus, inferring that lack of such medical documentation was inconsistent with

Plaintiff's allegations of disability. Also, the record showed that Plaintiff's diabetes was controlled when she was compliant with prescribed treatment, her intraocular pressure dropped with medication, and her glaucoma was currently stable, demonstrating that her symptoms were controllable through treatment to the point that they were not disabling. Id. at 16.

The ALJ found that there was no evidence in the record of significant medical worsening of Plaintiff's ailments since she last worked full-time, evidenced by the absence of any doctor's orders to cease working. The ALJ stated that the majority of Plaintiff's impairments predated her alleged onset date, during which she was employed full-time. The ALJ also relied upon the lack of evidence demonstrating the deterioration of work activity due to any ailment-related symptomology, such as an employer's letter, and again noted that Plaintiff continued to work for the same employer. Id. at 17.

The ALJ concluded that Plaintiff's ability to pass her driver's license test, and to engage in daily activities such as driving, preparing meals, taking care of her house, visiting with her grandson, and eating out were inconsistent with an inability to engage in competitive employment. The ALJ found that Plaintiff's description of her symptoms and limitations in function were not fully credible.

The ALJ concluded that Plaintiff's impairments precluded: more than occasionally climbing ramps and stairs, exposure to hazardous machinery and unprotected heights, employment requiring peripheral vision, more than occasional sudden changes from light to dark, and more than occasional driving at night. The ALJ stated that these RFC

findings were consistent with the findings of Plaintiff's treating physicians, Plaintiff's testimony, and the findings of Dr. Ringer. The ALJ found that Plaintiff had failed in her burden of establishing a more restrictive RFC. Id.

The ALJ determined that the testimony from the VE that a hypothetical individual with the functional restrictions above could perform Plaintiff's past relevant work as a legal secretary and office manager was credible, and concluded that Plaintiff could perform her past relevant work. Accordingly, the ALJ concluded that Plaintiff was not disabled and had not been disabled since the alleged onset date and through the date of the ALJ's decision (August 5, 2006). Id. at 17-18.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have

supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423 (d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's

impairment meets or is equal to one of the impairments listed in Appendix I.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any, as she actually performed it, or as generally required by employers in the national economy.  If the claimant has past relevant work and is able to perform it, she is not disabled.  If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

**ALJ's Determination that Plaintiff Could Perform her Past Work**

Plaintiff argues that in determining that Plaintiff could perform her past work, the

ALJ improperly disregarded Plaintiff's testimony, Dr. Obermark's July 29, 2004 letter, and the medical record, and instead relied upon the RFC assessment prepared by Huff. Plaintiff argues that Huff's RFC assessment was clearly flawed in that it indicated that Plaintiff had no visual limitations and no exertional limitations, and further that Huff is not a medical person. Plaintiff argues, based upon the DOT definition for legal secretary, that the ALJ's decision that she could perform that job is not supported by the record. Plaintiff argues that the ALJ should have applied the Guidelines to Plaintiff, specifically, Rule 201.06 of Table 1, applicable to individuals of Plaintiff's age and education who were limited to sedentary work and who had non-transferrable skills from skilled or semi-skilled past work, to find that Plaintiff was disabled.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2).

Here, Dr. Obermark's opinion in the July 2004 letter that Plaintiff's visual loss would make her sedentary work 80 percent more difficult is inconsistent with the fact that Plaintiff worked full time with her vision problems essentially the same as they were after

her alleged disability onset date.  Furthermore, although her job duties might have been somewhat decreased, Plaintiff continued to work for pay one day a week, and on at least one occasion, three days a week, after her alleged onset date.  Also, as the ALJ noted, Dr. Ringer did not preclude all work activity due to Plaintiff's eye problems.  Thus Dr. Obermark's opinion in question was not consistent with the record as a whole, and the ALJ was entitled not to rely upon it.  See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (stating that ALJ may elect in certain circumstances not to give controlling weight to treating physician's opinion, as record must be evaluated as whole; final RFC determination is left to ALJ).

Furthermore, an ALJ is not required to rely on the opinion of a treating physician who has only seen the Plaintiff three or fewer times.  Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the medical opinion of a treating physician was not entitled controlling weight because the Plaintiff had only met with the treating physician on three prior occasions).  The record only contains evidence that Plaintiff saw Dr. Obermark once prior to Dr. Obermark's July 2004 letter.

Contrary to Plaintiff's assertions, the ALJ did not rely solely on the RFC completed by Huff, and gave several valid reasons for his credibility findings.  The ALJ found that Plaintiff's description of her symptoms and functional limitations were not fully credible because Plaintiff did not use any strong pain medication, did not have long term and significant atrophy or loss of muscle tone, her symptoms were essentially controllable through treatment, and there was no evidence of medical worsening of her

ailments since the time she was working full time. As these reasons are all supported by the record, the Court defers to the ALJ's determination that Plaintiff was not fully credible with regard to her allegations of disabling impairments. See Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) (stating that ALJ's credibility determination is entitled to deference if based on good reasons).

Significantly, as the ALJ noted, Plaintiff stated that she did not stop working because of her alleged disability, but because of her employer's death. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001) (noting that ALJ's finding that plaintiff not fully credible was supported by fact that plaintiff did not lose his job because of his disability, but because his position was eliminated)). Here, as noted above, Plaintiff continued to work one full day a week regularly, and there is substantial evidence in the record to support the ALJ's determination that she could do so five days a week.

Lastly, the Court notes that application of the guidelines would seem to result in a decision that Plaintiff was not disabled. Plaintiff argues that Rule 201.06 applies to her, but that rule applies when skills from skilled or semiskilled previous work experience are not transferrable. Here, the VE testified that Plaintiff's skills would be transferable, thus Rule 201.07 would apply for a result of "not disabled."

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 19th day of June, 2008